**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 95-10359**
**Summary Calendar**

**MARJORIE A. ZIELKE,**

**Plaintiff-Appellant,**

**VERSUS**

**GTE DIRECTORIES CORP., ET AL.,**

**Defendants,**

**GTE DIRECTORIES CORP., and**
**GTC DIRECTORIES SERVICE CORP.,**

**Defendants-Appellees.**

Appeal from the United States District Court
For the Northern District of Texas
(4:94 CV 206 A)

(August 31, 1995)

Before DAVIS, BARKSDALE, and DeMOSS, Circuit Judges.

PER CURIAM:[1]

---

[1] Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the Court has determined that this opinion should not be published.

Marjorie Zielke appeals from summary judgment entered in favor of her former employer, GTE Directories Corporation, in this sex discrimination suit. Zielke's original complaint alleged that disparate treatment on the basis of sex occurred after she was transferred to GTE's marketing department in 1991 and continued until she was discharged from GTE in 1993, all in violation of 42 U.S.C. § 2000e, et seq. (1994). The district court granted summary judgment in favor of GTE. We affirm.

## Zielke's Transfer and the Reorganization

From 1986 until 1991 Majorie Zielke was employed in GTE's corporate development and strategic planning department. In 1991, GTE's president recruited Zielke to transfer from the corporate development and strategic planning department, where she held the position of director, to GTE's marketing department. Zielke alleges that she was promised several inducements that were material to her decision to accept the transfer including, *inter alia:* (1) retention of her present rank, compensation and benefit package; (2) a four-member staff; and (3) responsibility for certain key areas of product development. Zielke was also promised that she would not be supervised by Phillip Abdelnor, then a manager in GTE's marketing department.

Zielke's transfer did not go as she anticipated. Initially, she received fewer staff members than she was promised. Several months later, marketing vice-president Clint Pollard decided to reorganize the department to eliminate inefficiency and reduce the number of people reporting directly to him. Forty-two employees,

both male and female, were laid off.  Many other employees received different titles and were subject to a new reporting structure.  Zielke's position was reclassified as that of "manager," rather than the more prestigious "director."  She also lost her parking space and was required to share a secretary with another employee.  Zielke did not, however, suffer any decrease in salary or other employee benefits.

Zielke was also placed under the supervision of marketing director Phillip Abdelnor.  Zielke claims that Abdelnor was difficult to work with, that he often changed her job objectives and then held her responsible for the original objectives, that he told her male subordinates that they did not have to work for her, and that he gave her false and malicious job performance reviews.  It is undisputed that Abdelnor and Zielke quarreled about her performance both publicly and privately on more than one occasion in late 1992 and early 1993 and that Abdelnor cautioned Zielke that he considered her attitude to be insubordinate.

## Zielke's Discharge

In January 1993, Zielke was terminated from her position with GTE.  According to GTE, Zielke was discharged because she (1) altered a purchase requisition form to authorize an expenditure beyond her authority after her supervisor had expressly rejected the requested amount; (2) failed to provide reports and plans requested by her supervisor; (3) failed to eliminate language from promotional literature that promised GTE would provide tracking services, after it became apparent that such service was not

3

feasible; (4) authorized two expenditures far in excess of her signing authority; and (5) was insubordinate in these and other acts.

**(1) Alteration of the Purchase Requisition**

In November 1992, Zielke asked Abdelnor to sign an "open" purchase requisition for $20,000. Because that procedure varied from that usually employed by GTE, and because he could not ascertain what goods and services were being procured with the requisition, Abdelnor requested further information from Zielke. In mid-December, Abdelnor received a message that the requisition had to be signed immediately. Because he still had not received the requested information from Zielke, Abdelnor reduced the purchase requisition amount from $20,000 to $10,000, which was the upper limit of Zielke's signing authority. Zielke subsequently obtained the form, altered the $10,000 figure back to $20,000 and submitted the form to purchasing, without Abdelnor's approval.

Zielke does not deny that she changed the form without contacting Abdelnor first, but claims that she noted on the bottom of the form that the change was necessary and sent a copy to Abdelnor. GTE claims that Abdelnor did not receive the notated form until much later. GTE further responds that Zielke's note served to clarify only the propriety of the amount requested, and not the insubordination inherent in taking that course of action. Upon learning that Zielke had changed the form, Abdelnor contacted GTE's human resources department about the matter.

**(2)  Failure to Complete Job Objectives and Insubordination**

4

Zielke's priority project in the marketing department was a new couponing project called "special editions." As originally contemplated, GTE would "track," or gather discrete information about, persons redeeming coupons issued by GTE for their customers. Tracking is intended to aid advertisers' efforts to identify and target a particular market. In October 1992, GTE approved a "special editions" business plan proposed by Zielke. That plan included a tracking feature. By early 1993, however, Zielke had proposed no concrete method for achieving the tracking feature and GTE management, particularly Abdelnor, was concerned about whether tracking was a viable feature of the program. On January 6, 1993, Zielke and Abdelnor met and Abdelnor requested a written plan for the tracking feature. When that plan was not received, Abdelnor instructed that tracking be removed from the "special editions" plan. In the January 6 meeting, Abdelnor also expressed concern over Zielke's failure to submit a complete sales plan for the new product and assigned a January 8 deadline for that plan. The next day, Abdelnor discovered that Zielke had approved two "special editions" expenditures, which totaled $80,850, without his prior authorization. At that time, it is undisputed that Zielke's signing authority was limited to $10,000.

On January 8, Abdelnor sent Zielke a memo detailing several deficiencies in Zielke's performance that had been discussed at the January 6 meeting. In addition to the matters discussed above, the memo stressed Zielke's response to Abdelnor as a supervisor and her open "defiance" of his authority in private meetings and in front

5

of other employees. Subsequently, Abdelnor discovered that Zielke had not removed the promise of tracking from final versions of the promotional literature for the "special editions" product. Abdelnor further claims that he never received the requested sales plan. Zielke claims that the sales plan was sent facsimile on the date it was due and that she made handwritten changes to the advertising copy, which deleted the promise of tracking. Zielke does not dispute, however, that she altered the purchase requisition form or that she approved expenditures in excess of her authority, which GTE claims, in addition to subordination, would have justified her termination. On January 14, Zielke was given an opportunity to explain her position in a meeting with Abdelnor and a representative of GTE's human resources department. On January 15, 1993, Zielke was discharged.

### APPLICABLE LAW

We review summary judgment *de novo*, applying the same standard as did the district court. **Garcia v. Elf Atochem N. Am.**, 28 F.3d 446, 449 (5th Cir. 1994). The facts are reviewed in a light most favorable to Zielke, the non-movant. **Id**. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C). Such a finding may be supported by the absence of evidence to establish an essential element of the non-movant's case. **Hibernia Nat'l Bank v. Carner**, 997 F.2d 94, 98 (5th Cir. 1993).

Zielke offers no direct evidence of sex discrimination.  Thus, her claim is controlled by **McDonnell Douglas**' burden-shifting framework.  To establish a prima facie case of sex discrimination, Zielke must show that GTE either (1) filled her position with a male employee or (2) retained similarly situated male employees, while discharging Zielke.[2]  There is no dispute that Zielke was replaced by a female.  Zielke maintains, however, that two male employees who engaged in similar or more egregious misconduct were retained, while she was discharged.

GTE claims to have terminated Zielke, in part, because she changed a purchase requisition form to reflect a $20,000 purchase, after her supervisor had expressly rejected the request for $20,000, authorizing only $10,000 instead.  Zielke alleges that a male employee, Rudluff, altered a similar company document, after it had been signed by his supervisor on at least two occasions and that Rudluff was not terminated.

Rudluff was not an employee in a similar situation as Zielke and his actions were not analogous to those taken by Zielke. Rudluff's position as a "systems administrator" in the marketing department required that he requisition suitable computer equipment for in-house use by GTE employees.  Requests for computer

---

[2] Prima facie proof of disparate treatment discharge requires that plaintiff demonstrate that she: (1) is a member of the protected class; (2) was qualified for the job held; (3) was discharged; and (4) was either replaced by a person outside the protected class or that the employer retained similarly situated employees outside the protected class.  See **Mayberry v. Vought Aircraft Co.**, 55 F.3d 1086, 1089 (5th Cir. 1995); **Wilson v. Belmont Homes**, 970 F.2d 53, 57 (5th Cir. 1992); **Smith v. Wal-Mart Stores**, 891 F.2d 1177, 1180 (5th Cir. 1990).

equipment, which were made on "PC and Intelligent Workstation Services Request" forms, were often completed in pencil so that Rudluff could change the form if required. Rudluff's amendment of PC Services forms was a pre-authorized practice that was contemplated as part of his job by relevant management personnel. Unlike purchase requisition forms, PC Services forms do not require that dollar amounts be entered. Indeed, the structure of the form indicates that its primary purpose is to record computer needs (which may then be filled from existing equipment or ordered), not to authorize expenditure for those needs.

In contrast, Zielke increased the amount authorized on a purchase requisition form, with knowledge that her supervisor had already reduced the amount she requested, and without contacting him prior to taking that action. Further, Zielke does not dispute that she also authorized other expenditures in excess of her signing authority. That fact alone is sufficient to distinguish Rudluff's pre-authorized alteration of company forms on matters falling within his assigned authority from Zielke's actions.

Zielke also claims that Crandall, a marketing department director, was a similarly situated male for purposes of her prima facie case. Crandall was apparently involved in an ongoing sexual relationship with one of his subordinates, which was discovered by Pollard, GTE's marketing vice-president. Instead of being terminated, Crandall was allowed to move to a lower position with a cut in pay. Crandall's behavior, Zielke argues, is at least as bad, if not worse, than her own insubordination, poor performance

8

and alteration of company documents. Crandall's off-duty, off-premises indiscretions do not place him in a similar position as Zielke, and the relationship between the two incidents is too remote to be credible evidence that GTE terminated Zielke because of her sex.

Zielke failed to establish a prima facie case of discrimination. Nor is there any other evidence that GTE's asserted reasons for Zielke's discharge were a mere pretext for discrimination. Zielke does not deny that she changed the purchase requisition form or that she authorized expenditure in excess of her signing authority. She does not deny that she and Abdelnor argued frequently about the scope of her responsibilities and her responsiveness to his assignments. See **Mayberry v. Vought Aircraft Co.**, 55 F.3d 1086, 1091 (5th Cir. 1995); **Little v. Republic Refining Co.**, 924 F.2d 93, 97 (5th Cir. 1991) (even an employer's incorrect belief that an employee's performance is inadequate constitutes a legitimate nondiscriminatory reason for termination).

Zielke thus retained both the burden of production and the burden of persuasion on the ultimate issue of whether GTE intentionally discriminated against her on the basis of sex. Zielke offers scant evidence that GTE's actions were motivated by her sex.[3] Zielke claims that she and one other female were demoted

_____

[3] Zielke initially claimed that GTE engaged in a continuing pattern of discrimination against her that began with her transfer to GTE's marketing department and continued until her discharge. On appeal, Zielke argues only her discriminatory discharge claim. Therefore, it is unnecessary to consider GTE's argument that Zielke's disparate treatment claims related to GTE's reorganization are time-barred because they were based on conduct occurring more

9

from director to manager as part of GTE's reorganization. Zielke does not compare that figure to the number of men demoted. What is clear from the record, however, is that the reorganization affected in excess of 42 employees and that, as reconstituted, the marketing department had an equal number of male and female directors. Zielke's remaining evidence of discriminatory discharge, that neither Rudluff nor Crandall were fired, is equally unavailing. There is no evidence to suggest that Rudluff's activities, like Zielke's, were in direct contravention of her supervisors expressed wishes. Crandall's alleged indiscretions did not pose a similar threat to GTE's business operations as did Zielke's defiant breach of rank. While the record might raise a fact issue as to whether Zielke received the benefit of her bargain when she transferred to marketing or whether management treated her harshly or unfairly, it does not raise a genuine issue of material fact on the issue of whether GTE intentionally discriminated against Zielke on the basis of her sex.

The district court is **AFFIRMED.**

---

than 300 days before she filed an administrative charge with the EEOC. See 42 U.S.C. § 2000e-5(e)(1). GTE also argues that § 2000e-5(e)(2) precludes not only claims based on conduct occurring outside the filing period but also any evidence of conduct occurring outside the filing period. That issue is also unnecessary. Assuming arguendo the evidence offered by Zielke of disparate treatment in the reorganization was admissible, it simply is not sufficiently probative to create a fact issue as to discriminatory intent on her discharge claim.

opin\95-10359.opn